```
               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF VERMONT
                                      :
DAVID M. FISHER,                      :
     Plaintiff,                       :
                                      :
     v.                               :    No. 2:06-cv-178
                                      :
GLOBAL VALUES, INC.,                  :
     Defendant.                       :
                                      :
```

### MEMORANDUM AND ORDER

This diversity action regards a service agreement that the parties signed on November 3, 2003.  Plaintiff David Fisher commenced this suit on September 13, 2006, seeking a declaratory judgment that non-competition and non-disclosure clauses contained in that agreement are invalid.  Currently before the Court is Fisher's Motion for Preliminary Injunction seeking to enjoin enforcement of those clauses.  A hearing was held on the Motion on October 4, 2006, continued to October 26, 2006.  For the reasons stated below, Plaintiff's Motion for Preliminary Injunction (Doc. 2) is GRANTED in part and DENIED in part.

### I.   Background

Defendant Global Values, Inc. ("Global Values") is an Illinois corporation in the business of importing, etching and carving granite monuments and memorials.  Global Values exclusively sells granite imported from China and India.  Anandan Subramanian is the President and Muthlakshmi Anandan, his wife,

is the Vice President of Global Values.

Fisher has spent his career in the granite industry. He began working for his father at Apex Memorials Company as a teenager, and eventually served as that company's President. He was the co-owner of the granite company Precision Stoneworks between 1991 and 1998, and the General Manager of EW Granites, specializing in imported granite, between 1998 and 2003. (Ex. 1.) Fisher dealt with customers and made sales in each position. Since 1998 Fisher has worked selling imported rather than domestic granite, and he is currently more knowledgeable about imported granite. (Ex. 1, 1.) Fisher has worked in other industries, but rarely worked entirely outside of the granite industry for long.[1] Most recently prior to his association with Global Values he worked part-time as a teacher's aide between 2001 and 2003 in order to care for his father during illness. He was paid very little in that position compared to his earning capacity in the granite industry.

In 2003, the parties entered into a service agreement, under which Fisher agreed to work for Global Values as a "service provider," to "exclusively provide for the benefit of the Company the services as follows: (a) generating new clientele and (b)

---

[1] For example, between 1998 and 2003 Fisher was the co-owner of a limousine company, and also worked for EW Granites between 1998 and 2000. Between 1977 and 1987 Fisher was the President of Apex Memorials Co., and between 1981 and 1987 he was also the President of Antsie's Limit Ltd., a restaurant/tavern which he started and operated.

servicing existing clientele in the area of wholesale finished monument and mausoleum sales." (Ex. 2 ¶ 4.)  The term of the agreement was two years, with a termination clause entitling Fisher to specified severance pay if Global Values were to terminate the contract before that time.  (Ex. 2, ¶ 3.)  The agreement included non-competition and non-disclosure clauses. (Ex. 2 ¶¶ 6-7.)  When Fisher and Anandan Subramanian were negotiating the contract, Fisher had recently lost a job because the employee company was sold shortly after he began work. During negotiations, therefore, Fisher focused primarily on the termination clause rather than the non-competition and non-disclosure clauses.  Fisher and Muthlakshmi Anandan signed the contract on November 3, 2003, and it took effect on January 1, 2004.[2]

The non-disclosure clause reads as follows:

> The service provider [Mr. Fisher] in turn agrees not to disclose the product line, customer list, price structure, promotion and special prices, and the granite colors of India Black, India Red, India Mist, Paradiso, Bahama/Coral Blue, Silk Blue, Cats Eye.  That is marketed by the company, companies' suppliers and other salesman contact information to any other competitor or knowingly to anyone who may act in a way that would be of conflict for the sales and

---

[2]The agreement itself states that the agreement is "entered in to as of 1st day of January 2003."  However, Global Values notes that the year listed is in error. (Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. 5-6.)  Although Global Values asserts that Plaintiff's counsel has attempted to misrepresent the dates based on this error (Def.'s Opp'n 6) it does not appear that there is any real dispute as about the dates, as Fisher's testimony at the October 4, 2006 hearing was that the contract in fact took effect at the beginning of 2004, not of 2003.

> marketability of the companies' products. The service provider will maintain the non-disclosure during and after the term of service."

(Ex. 2 ¶ 6.)  The non-competition clause reads as follows:

> Further the service provider agrees, during and for a period of two years after the termination of the service agreement, not to compete with the company as follows: (a) The service provider agrees not to sell or solicit business directly or indirectly to any of the companies' customers concerning the colors of India Black, China Black, India Red, India Mist, Paradiso, Bahama/Coral Blue, Silk Blue, cats Eye [sic].  And the products derived there from which are distributed by the company. (b) The service provider agrees not to sell or solicit business directly or indirectly to customers in a radius of fifty miles around a customer the service provider delt [sic] during the service agreement, concerning the colors of India Black, China Black, India Red, India Mist, Paradiso, Bahama Blue, Cats Eye.  And the products derived there from which are distributed by the company.

(Ex. 2 ¶ 7.)

When Fisher began work for Global Values, the company did not have an office in Vermont and Fisher worked primarily from his basement, trying to build up the company's business in the Northeast.  Fisher initially received a salary of $755.00 per week, or $39,260.00 per year, as provided in the service agreement. By May of 2004 his pay had increased to $46,800.00 per year.  Fisher sold Global Values products both to his own former clients and contacts and to new contacts that he made through Global Values.  Fisher was able to name 44 Global Values' customers who were his contacts long before he began work on behalf of Global Values.  (<u>See</u> highlighted portions of Ex. Y.)

4

In August of 2004, the relationship between the parties changed. Fisher became an employee of Global Values, rather than an independent contractor or "service provider," and was given the title "Sales Manager." Global Values changed his salary to $50,000 per year, and changed other details of his compensation: he was added to Global Values' payroll, and Global Values began withholding payroll taxes from his payment and providing him with a W2 form for tax reporting purposes.

Most importantly, Global Values entered into a co-employment relationship with Administaff Companies ("Administaff"), giving Administaff equal control over Fisher's employment. Fisher signed an "Employment Agreement" with Administaff, which stated that Fisher's employment was at-will. It also gave Administaff a right as Fisher's co-employer to "make personnel decisions and to evaluate Employee's qualifications, duties, work assignments and job performance," but not to make decisions with regard to Global Values' products or services. (Ex. B ¶¶ 2-3.) Additionally, the contract obliged Fisher to abide by all Administaff policies made known to him. (Ex. B ¶ 8.) This contract drastically changed the nature of Fisher's relationship with Global Values; beyond changing his title and compensation, the new arrangement made Fisher responsible to a new set of potential supervisors and specifically changed aspects of his employment from the original service agreement.

Fisher was concerned about the term in the Administaff contract which provided that his employment would be at-will. He raised these concerns with Anandan Subramanian, who wrote him a letter dated August 27, 2004 in response. The letter states that it is written "guaranteeing Global Values Inc. commitment to stick with the terms of the original contract." It reads, in part:

> Administaff employment contract may say your services can be terminated with out any notice either by you or by them. By this letter, I would like to confirm that, irrespective of who we use to administer the pay role [sic] and benefits we will abide by our original service contract and terms of the contract. I will guarantee the service charges due to you as the minimum benefit for the entire period of the contract as per terms of the contract. By the same token you are also required abide by the terms of the same contract. I sign this letter guaranteeing Global Values Inc. commitment to stick with the terms of the original contract. Please acknowledge and sign this letter as a sign of your acknowledgment.

(Ex. C.) Fisher did sign the letter as requested. The significance of the letter's command that Fisher "abide by the terms of the same contract" is not clear, and could refer either to the original service agreement or the Administaff contract. Notably, this letter does not reference the non-disclosure and non-compete clauses.

In 2005 Fisher felt that his responsibilities began to be curtailed and that he was left out of important consultations. Meanwhile, Subramanian was dissatisfied with Fisher's sales numbers and believed that Fisher was not following through

adequately with customers.  In the spring of 2006, Subramanian told Fisher that he was not sure that Fisher was the type of person he wanted working at Global Values.  Fisher felt that his employment was in jeopardy and sought to be released from the non-competition and non-disclosure clauses.

Also around 2006, Subramanian became suspicious of Fisher's loyalty to the company.  Global Values now asserts that Fisher is engaged in a conspiracy with Sinostone, Inc. ("Sinostone") a company that has offered to employ him if he is released from the non-competition clause.  The object of the alleged conspiracy is to convince the independent sales representatives who now sell Global Values products to work for Sinostone with Fisher to steal Global Values customers.  Global Values presented scanty evidence at best on this point, consisting of one comment that Fisher made in anger toward the end of his employment and a single meeting between Fisher and a Sinostone representative in March of 2006.[3]

In May 2006 Fisher suggested to Global Values that he become an independent sales representative for Global Values and that the non-competition and non-disclosure clauses be concomitantly rescinded from the Agreement.  He repeated this request by letter

---

[3] Global Values' concerns regarding a possible conspiracy between Fisher and Sinostone have not been considered either in determining whether the non-competition clause embodies a reasonable restriction or in determining the balance of hardships between the parties, given the dearth of evidence at this early stage of the proceedings.  However, as this is a Motion for Preliminary Injunction, if new evidence of a conspiracy emerges the Court has continuing jurisdiction to revise its holdings.

on August 8, 2006, and on August 29, 2006, his counsel sent Global Values a request to release Fisher from the non-disclosure and non-competition clauses.  Without giving these requests any definite answer, Global Values terminated Fisher's employment on September 11, 2006.  The Termination Notice informs Fisher that he is "not to contact any customers of Global Values Inc. for any reason," and is "expected to fulfill your contractual obligations to the company regarding non disclosure and non competition." (Ex. 3.)  On September 13, 2006, Mr. Fisher filed this lawsuit.

## II.  Discussion

On a motion for preliminary injunction, the moving party must show "that it will suffer irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."  Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).

**A.  Non-Competition Clause**

　　**1.  Irreparable Harm**

Irreparable harm is that "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  Brenntag, 175 F.3d at 249. Monetary harm ordinarily does not constitute irreparable injury.

Id. However, injuries due to lost employment opportunities may be more than monetary. See MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1242 (11th Cir. 2005) (finding that enforcement of non-solicitation and confidentiality provisions of employment agreement would cause "irreparable harm which cannot be undone through monetary remedies," due to injuries "in the form of lost opportunities, which are difficult, if not impossible, to quantify.")

Fisher presented evidence that Sinostone offered him a job selling imported granite, but then declined to hire him upon reading the text of the non-competition clause. He claims that the non-competition clause will be a barrier to his employment at all of the companies in the granite industry where he is otherwise likely to find employment, causing him irreparable harm.

Global Values asserts a limited interpretation of the non-competition clause which it claims would eliminate Fisher's inability to obtain employment in the granite industry. Global Values now reads the clause to prevent Fisher from selling to active Global Values customers, and from selling the named eight colors to customers that he dealt with personally, or to anyone within 50 miles of those customers. This interpretation is not obvious from the language of the agreement, which could easily be read more broadly.

In any case, the clause would cause irreparable harm even under Global Values' interpretation.  Global Values has 570 customers to whom Fisher could not sell any products.  According to Global Values, Fisher personally sold to customers in 74 cities and 15 states, not including Vermont, where he sold to customers in 16 cities.  If Fisher could not sell the named colors to anyone within 50 miles of those customers, he would not be able to sell them within his home state of Vermont at all.  Also, as Global Values customers–and the customers of the Barre granite industry generally–are located predominantly in the Northern states, Fisher would be barred from selling the named colors in the very geographic areas in which he would be most likely to find a market for them.  Even limited to sales of the named colors, the 50 mile restriction would cause Fisher irreparable harm, since those colors are not exclusively sold by Global Values; rather, they are common in the industry and nearly all companies that sell imported granite sell one or more of the named colors.[4]  It is not likely that any company will hire a

---

[4]The named colors are also known by other names, as many companies invent their own names for the same types of stone.  Subramanian testified that his intent in drafting the non-competition clause was to include the granite *types* listed, regardless of the names under which they are sold.  For example, by writing "China Black" he intended to exclude all of the black granite from China, which is sold under names including Midnight Black, Oriental Black, and China Black.  Fisher was not aware of this intent, and believed when signing the contract that he was restricted from selling granite under the listed names, but not that he was restricted from selling all granite from the listed locations.  There is sufficient overlap among the names used by various companies for these types of stone that the Court finds that the restriction would cause Fisher irreparable harm even if his more modest interpretation of the restriction were to prevail.

salesman whose sales are so broadly restricted.

Global Values has asserted that Fisher could work in the domestic granite industry.  However, the domestic granite industry, in which profit margins are around 3 to 5 percent, is faltering by comparison with the imported granite industry, where profit margins are around 40 to 45 percent.  Few domestic granite companies are hiring, and Fisher's recent experience and expertise concern imported granite such that he is best suited to a job selling imported granite.  An expert witness for Global Values suggested that it would be possible for Fisher to make a living as a salesman of domestic granite, but could not name a single salesman who did not sell any imported granite.  Global Values also asserts that Fisher could work outside of the granite industry.  However, the bulk of Fisher's professional experience is in the granite industry, which offers employment highly superior to the other opportunities available to him.

The alternatives suggested by Global Values would not alleviate Fisher's hardship if the clause were enforced.  The non-competition clause likely would effectively bar Fisher from employment in the granite industry while it remained in effect.  The harm to Fisher from a two-year period outside of his field would not be merely monetary and could not be cured by a monetary remedy.  Fisher's lost employment opportunities during that time, and consequent loss of standing within the industry as his

knowledge of the field and contacts within it become less current, constitute irreparable harm.

## 2.  Likelihood of Success on the Merits

Fisher is likely to succeed on the merits with respect to the non-competition clause.  First, its language is so over-inclusive as to be likely unenforceable. Second, when Fisher became an official employee of Global Values in August of 2004 the service agreement ceased to govern the parties' relationship; therefore, the two-year non-competition period specified in the service agreement has now expired.

Restrictive covenants must be narrowly written to protect employers' legitimate interests, and are reviewed for their reasonableness.  Summits 7, Inc. v. Kelly, 178 Vt. 396, 400, 886 A.2d 365, 369 (2005).  The rule in Vermont is that "a restrictive covenant in an employment context will be enforced unless the agreement is found to be contrary to public policy, unnecessary for protection of the employer, or unnecessarily restrictive of the rights of the employee, with due regard being given to the subject matter of the contract and the circumstances and conditions under which it is to be performed."  Id. at 403, 371 (citing Vt. Elec. Supply Co. v. Andrus, 132 Vt. 195, 198, 315 A.2d 456, 458 (1974)).  Restrictive covenants may not protect employers against ordinary competition.  See Summits 7, Inc., 178 Vt. at 399-400, 886 A.2d at 369.

12

The non-competition clause is not reasonable, as it is unduly restrictive of Fisher's rights and does not serve the legitimate interests of Global Values.  Non-competition agreements "are narrowly construed by the courts and must contain time, geographic and/or industry limitations." A.N. Deringer, Inc. v. Strough, 103 F.3d 243, 48 (2d Cir. 1996)(citing Vt. Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 149 (2d Cir. 1996).  While Global Values currently asserts an interpretation of the non-competition clause which purports to contain such restrictions, they are not apparent on the face of the clause.  In any event, the non-competition clause is overbroad even as construed by Global Values.  The 50 mile restriction, in particular, is unnecessarily restrictive of Fisher's rights, due to its grave effect on his ability to work in the profession of his choice.  Global Values has not shown that such a broad restriction is necessary to protect its interests; beyond an unsupported concern that Fisher might sell to Global Values customers under other names if allowed to sell granite in their geographic regions, it has offered no justification for the 50 mile restriction.  Although the 50 mile restriction only applies to certain colors, those colors are too common to constitute a meaningful limitation on the clause's breadth.

The second reason that Fisher is likely to prevail on the merits with respect to the non-competition clause is that the

clause lasts for only two years, which have now passed.[5]  Once Fisher became a regular employee of Global Values, his employment ceased to be governed by the original service agreement, as the dynamics of the original relationship specified in that agreement were dramatically altered when Administaff became a co-employer with control over Fisher.  The new arrangement between the parties effectively supplanted the original service agreement.

The letter that Anandan Subramanian provided to Fisher guaranteeing his entitlement to severance pay did not revive the original agreement.  The letter's text is ambiguous as to whether it reaffirms the original contract, rather than merely modifying the Administaff contract's at-will provision by guaranteeing Fisher severance pay.  Neither the letter nor the Administaff contract mentions the non-competition or non-disclosure clause.  On this record, the Court cannot find that the non-competition and non-disclosure clauses were still intended to apply after the change in the employment relationship embodied in the Administaff contract.[6]  Absent a clearer statement, the Court declines to find that Fisher remained bound by the original agreement after his employment status was changed.  Therefore, the non-

---

[5] The non-disclosure clause is not time-limited; therefore, it continues to apply regardless of when the original service agreement ceased to govern the parties' relationship.

[6] Fisher's testimony on cross-examination that he understood the letter to mean that the original agreement would continue to apply, including the non-competition and non-disclosure clauses, is insufficient to require a contrary conclusion where the letter's actual language is so unclear.

14

competition period began in August of 2004.  That period lasted, according to the service agreement, for two years, and expired in August of 2006.  Fisher is likely to prevail on the merits on the grounds that the non-competition period has ended as well as because the non-competition clause is so overbroad and unclear as to be unenforceable.

### 3. Balance of Hardships

As the Court holds that Fisher is likely to succeed on the merits with respect to the non-competition clause, there clearly are sufficiently serious questions going to the merits to make them a fair ground for litigation.  In addition, the balance of hardships favors the Plaintiff.

Global Values faces competition with respect to the granite colors cited in the clause, which are widely sold by other companies in the imported granite market.  Fisher's employment with one of those companies, in competition with Global Values, could cause Global Values some degree of hardship.  See Sys. & Software, Inc. v. Barnes, 178 Vt. 389, 394, 886 A.2d 762, 766 (2005) (upholding the enforcement of a non-competition agreement where the employee had acquired knowledge of "the strengths and weaknesses of [his employer's]...products" and it would be "extremely difficult to monitor whether defendant was using the goodwill and knowledge he acquired" during his employment to gain a competitive edge against his former employer).  However, Global

Values would suffer less harm from a possible increase in a competitor's efficiency than Fisher would suffer from a total inability, for two years, to find employment within the granite industry in which he has spent most of his career.  Also, because the Court denies Fisher's Motion with respect to the non-disclosure clause, Fisher will be restricted from disclosing many details of Global Values' business.  This restriction will greatly reduce any harm that may result to Global Values from the grant of the preliminary injunction with respect to the non-competition clause.

**B.   Non-Disclosure Clause**

    **1.   Irreparable Harm**

Fisher has not shown that enforcement of the non-disclosure clause will cause him irreparable harm.  Fisher focused his arguments regarding irreparable harm on the effects of the non-competition clause, and did not show that the non-disclosure clause would affect his employment prospects in any way.  It is difficult to see how an inability to disclose Global Values' "product line, customer list, price structure, promotion and special prices, and the granite colors of India Black, India Red, India Mist, Paradiso, Bahama/Coral Blue, Silk Blue, Cats Eye,"[7] could irreparably damage Fisher's prospects for employment or

---

[7] The meaning of the colors as named in this context is somewhat ambiguous, but the Court reads the clause as prohibiting disclosure of listed information, including price lists and price structures, with regard to those specific colors marketed by Global Values.

cause him any other irreparable harm.

The Court does not read the non-disclosure clause as containing any restriction on Fisher's ability to contact customers; although he may not disclose Global Values' customer list, he is not barred from contacting or selling to individuals who may appear on that list.  Therefore, enforcement of the non-disclosure clause will not affect his employment in the same way as the non-competition clause.

**2. Likelihood of Success on the Merits**

Fisher is not likely to prevail on the merits with respect to the non-disclosure clause.  Enforceability of the non-disclosure clause depends on the same inquiry into reasonableness that applies to restrictive covenants in employment situations generally.[8]  Therefore, the clause will be enforced unless it is

---

[8]Both parties seem to assume information may be protected by a non-disclosure clause only if it is a trade secret, a conclusion that is incorrect based on the text of the Vermont Trade Secrets Act.  See Vt. Stat. Ann. tit. 9 § 4607.  Mr. Fisher relies on Dicks v. Jensen, 172 Vt. 43, 768 A.2d 1279 (2001) for the proposition that "protection of a customer list does not constitute a legitimate business interest where such lists do not comprise trade secrets and were available...outside the employment or contractual relationship." (Mot. for Prelim. Inj. 7.)  In fact, Dicks holds only that such a list is not a trade secret as defined in Vt. Stat. Ann. tit. 9 § 4601(3). Dicks, 172 Vt. at 46-48, 768 A.2d at 1282-83.  Global Values in response argues that the information that the Non-Disclosure clause covers, and particularly its customer list, is a trade secret under the statute. (Opp. to Mot. for Prelim. Inj. 16-18.)  Global Values appears to assume that information must be a trade secret to be entitled to any protection, referencing Dicks' statement that, "The Act was explicitly designed to displace other common law remedies for misappropriation of trade secrets." Dicks, 172 Vt. at 46, 768 A.2d at 1282.

While the statute does displace "conflicting tort, restitutionary, and any other law of this state providing civil remedies for misappropriation of a trade secret," it specifically states that it does not affect "contractual remedies, whether or not based upon misappropriation of a trade secret." Vt. Stat. Ann. tit. 9 § 4607.  Therefore, whether or not information constitutes a trade secret does not affect the parties' ability to contract regarding its nondisclosure.

"contrary to public policy, unnecessary for protection of the employer, or unnecessarily restrictive of the rights of the employee."  <u>Summits 7, Inc.</u>, 178 Vt. at 403, 886 A.2d at 371. Global Values has legitimate interests that the clause seeks to protect.  <u>See</u> <u>Sys. & Software, Inc.</u>, 178 Vt. at 394, 886 A.2d at 766.  Nor is the non-disclosure clause overly restrictive of Fisher's rights.  It specifies certain information which cannot be disclosed, and does not contain the sort of broad restriction on contact which makes the non-competition clause unreasonable. Thus, it is reasonably limited in its scope and is likely enforceable.

### 3. Balance of Hardships

There are not sufficiently serious questions going to the merits to make the non-disclosure clause's enforceability a fair ground for litigation.  Fisher has not presented any evidence that he will be subjected to hardship due to his inability to disclose the information listed in the non-disclosure clause. Global Values also has not presented extensive evidence of the harm that it would suffer were the non-disclosure clause not enforced, but could be harmed were the information listed to become known to its competitors.  As no harm to Fisher is apparent, the Court finds that the balance of hardships does not favor him.

### III.  <u>Conclusion</u>

The Court finds that Fisher would suffer irreparable harm from the enforcement of the non-competition clause, and that he has shown a substantial likelihood of success on the merits with regard to that clause.  In the alternative, the Court finds that there are at a minimum sufficiently serious questions going to the merits to make them a fair ground for litigation with respect to the non-competition clause, and the balance of hardships regarding that clause's enforcement favors Fisher.  Therefore, Plaintiff's Motion for Preliminary Injunction is GRANTED as to the non-competition clause.

As to the non-disclosure clause, the Court finds that Fisher would not suffer irreparable harm from its enforcement and has not shown a substantial likelihood of success on the merits.  Nor are there sufficiently serious questions going to the merits to make them a fair ground for litigation regarding the non-disclosure clause, and the balance of hardships does not favor Fisher.  Therefore, the Motion is DENIED as to the non-disclosure clause.  Fisher should immediately return to Global Values items within his possession that are listed in the non-disclosure clause.

Dated at Burlington, Vermont this 2nd  day of November, 2006.

                                          <u>/s/ William K. Sessions III</u>
                                          Hon. William K. Sessions III
                                          Chief Judge